# ATTACHMENT A

# STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), and the United States Attorney's Office for the District of Maryland ("DMD") (collectively, the "Offices") and Apprio, Inc. ("Apprio"). Apprio hereby agrees and stipulates that the following information is true and accurate. Apprio admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Offices pursue the prosecution that is deferred by this Agreement, Apprio agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information filed with this Agreement:

At all times material to the charges set forth in the Information filed with this Agreement:

As described below, Apprio, Inc. profited by corruptly influencing the process of awarding contracts funded by U.S. taxpayer dollars by bribing a public official at the United States Agency for International Development to obtain government contracts worth hundreds of millions of dollars. The illicitly obtained contracts also enabled Apprio to sell artificially inflated stock for millions of dollars to investors who suffered losses.

## RELEVANT ENTITIES AND INDIVIDUALS

Apprio, which was headquartered in Washington, D.C., contracted with the United States Agency for International Development ("USAID") and other agencies to provide various services. Since 1998, Apprio has grown to approximately 79 full-time employees and 27 independent contractors. Darryl Britt ("Britt") was the founder, owner and President of Apprio. In executing the bribe scheme and securities fraud schemes described below, Britt, at all times, acted as an agent within the scope of his employment of Apprio and with intent to benefit Apprio.

PM Consulting Group LLC d/b/a Vistant ("Vistant"), which was headquartered in Maryland and had a Washington, D.C. office in the same building as the USAID headquarters, contracted with government agencies, including USAID, to provide services. Since 2008, Vistant has grown to 123 full-time employees and 70 independent contractors who conduct global operations. At times, Vistant served as a subcontractor to Apprio on its USAID contracts, and at other times, Apprio served as a subcontractor to Vistant on its USAID contracts. Walter Barnes ("Barnes") was the founder, owner and President of Vistant.

Company 1 contracted with government agencies to provide information technology services. Apprio hired Company 1 and Vistant (Barnes' company) as subcontractors on USAID contracts. Paul Young ("Young") was affiliated with Company 1.

USAID was a government agency responsible for, among other things, distributing foreign aid. Watson was a USAID contracting officer who was responsible for, among other things, participating in the process through which contracts were awarded to government contractors to provide services to USAID.

Company 2 was a private equity firm based in California that invested its capital in various portfolio companies. In or around November 2023, Company 2 purchased a 20% equity stake in Apprio's parent company in connection with a deal that Britt negotiated with Company 2. As part of the deal, Company 2 also made a $4 million loan to Apprio secured in part by Apprio stock as collateral.

The Small Business Administration ("SBA") was a government agency that, among other things, administered a federal contracting training program for socially and economically disadvantaged small business owners (the "8(a) Business Development Program"). Apprio and Vistant obtained USAID prime contracts through the 8(a) Business Development Program.

## BACKGROUND ON THE SBA 8(a) BUSINESS DEVELOPMENT PROGRAM AND THE SBA SMALL BUSINESS INVESTMENT COMPANY PROGRAM

The U.S. government used taxpayer dollars to buy all types of products and services to further the mission of government agencies. In doing so, the government was required by law to consider buying products and services from small businesses.

The SBA worked with federal agencies, such as USAID, to award a portion of prime government contract dollars to eligible small businesses, including through the 8(a) Business Development Program for disadvantaged small business owners. The SBA promoted 8(a) Business Development Program participants with federal agencies like USAID to ensure that eligible disadvantaged small business owners had access to lucrative federal contracting opportunities, including through contracts that are set-aside for publicly available competition, or bidding, among 8(a) Business Development Program participants, as well as "sole-source" contracts, exclusively available to a single 8(a) Business Development Program contractor without a competitive bid process.

"Prime" contractors worked directly with the government. They managed any subcontractors and were responsible for ensuring that the work was completed as defined in the contract. Unlike prime contractors, subcontractors did not work directly with the government but instead worked for other contractors.

The process of requesting proposals, evaluating bids, and awarding contracts was governed by federal law and regulations. Like any government contractor, small business contractors were required to comply with regulations that governed the contracting process. These regulations were meant to protect the integrity of the procurement process, including provisions known as the "officials not to benefit" clause and "anti-kickback" provisions. Also to protect the integrity of competitive procurement processes, federal laws such as the Procurement Integrity Act prohibited

the disclosure of sensitive procurement information.

The mission of the SBA Small Business Investment Company ("SBIC") program was to stimulate and supplement the flow of private equity capital and long-term debt financing that American small businesses need to operate, expand, and modernize their businesses. SBA did this by licensing and providing capital to professionally managed equity and debt investment funds as Small Business Investment Companies.

## THE BRIBERY SCHEME

Between in or around 2013 and in or around 2023, Britt, Barnes and Young conspired with Watson to pay at least approximately $1 million in bribes to Watson in exchange for Watson agreeing to influence the award of approximately $552.5 million dollars' worth of USAID contracts to Apprio and Vistant. As part of the scheme, Watson accepted bribes from Barnes and Britt that were often funneled through Young to conceal their source. Watson received bribes through various methods such as cash payments, bank wire transfers, Cash App and PayPal, shell companies, two new computers, two new iPhones, mortgage downpayments on two homes, payments for a wedding, debt payments, tickets to a luxury suite at an NBA game, and employment of his relatives with Vistant and its subcontractor. In exchange for these bribes, Watson agreed to influence the award of fourteen USAID contracts to Apprio and Vistant, as summarized in this table:

|  | Timeframe | Contractor | Subcontractor | Contract Description | Value |
|---|---|---|---|---|---|
| 1) | 2013-2018 | Apprio | None | Staffing Contract | $4.8 million |
| 2) | 2014-2020 | Apprio | Vistant | Institutional Support | $46 million |
| 3) | 2015-2015 | Apprio | None | Knowledge Management | $22,000 |
| 4) | 2015-2018 | Apprio | None | Communications Support | $3.9 million |
| 5) | 2018-2023 | Vistant | Company 1 | Professional Management | $30 million |
| 6) | 2018-2023 | Vistant | Apprio/Company 1 | Professional Management | $25.5 million |
| 7) | 2018-2022 | Vistant | Company 1 | Administrative Support | $3.5 million |
| 8) | 2019-2025 | Vistant | None | Cybersecurity | $19.5 million |
| 9) | 2020-2022 | Vistant | Apprio | Technical Support | $28.5 million |
| 10) | 2022-2027 | Vistant | Company 1 | Administrative Support | $9 million |
| 11) | 2022-2027 | Vistant | None | Technical Support | $95 million |
| 12) | Not Awarded | Vistant | None | Planning and Learning | $143 million |
| 13) | Not Awarded | Vistant | None | Planning and Learning | $94 million |
| 14) | Not Awarded | Vistant | None | Professional Management | $49.8 million |
| **Approximate Total Value of Contracts** | | | | | **$552.5 million** |

### A. Apprio Prime Contracts 1-4 (Appx. Value of $54.7 Million)

In or around April 2013, following a series of emails between Britt and Barnes about the negotiations, Apprio obtained its first USAID contract. Once this first contract was awarded, Britt began to give Watson bribe payments to retain the initial contract and to obtain and retain

A3

additional contracts.

On or about June 6, 2014, Watson texted Young, "I had a long talk with [Britt] today … We need to talk about the potential money losses you are incurring and the fact you're not filthy rich[.]"

Young replied, "I could/would be making a lot of money."

Watson replied, "[T]he fact I have to ask you for money for BS stuff bothers the hell out of me ... Like I'm not smart enough to make millions for sourcing contracts[.]"

Young replied, "Believe me time will come."

Watson replied that with "mounting debt I almost asked [Britt] for a loan .... Or advance[.]"

On or about August 8, 2014, Britt and Young discussed how to conceal payments. Britt texted Young, "If possible, give it to some other third party to give him. That way you can honestly say you never gave him anything ... never give anything but cash to you know who[.]" The next month, USAID awarded Apprio the second contract, for which Vistant served as a subcontractor. That same month, after the award of the second USAID contract, Watson asked for an iPhone 6, which Britt conveyed to Watson via Young. The scheme continued in this manner for years.

On or about August 19, 2015, Britt texted Young about hiring Watson's relative: "I like him a lot. Time for you to hire him!!! I can't because of [Watson]. But I'm going to get him employed by one of my colleagues with these good companies that are our size[.]" Instead of Britt arranging to have Young hiring Watson's relative, Britt ultimately arranged for Barnes and Vistant, which was a subcontractor to Apprio, to hire Watson's relative.

On or about October 2, 2015, Britt sent a text message to Young concerning how to conceal the source of funds for Young to purchase a laptop computer for Watson on behalf of Britt, stating, "You know you can bill me an 'administrative fee'. How much was it?" After Young replied that it was $2,000, Britt stated, "Let's talk today about your next invoice to me."

After Apprio was awarded its third USAID contract (in March 2015) and fourth contract (in or around August 2015), Apprio graduated from the SBA's 8(a) program and was no longer eligible to be a prime contractor for new contracts with USAID under this program. Following this development, the conspiracy adapted and shifted such that Vistant became the USAID prime contractor and Apprio served as Vistant's subcontractor for new contracts.

After Vistant became the prime contractor, Britt paid Watson as Apprio's prime contracts, and the Vistant prime contracts under which Apprio was a subcontractor, remained ongoing. For example, in or around May 2016, Britt and Young texted about getting Watson a laptop that he requested. Britt texted, "Forgot to have [my associate] get apple laptop. I just ordered it at [a store]. Want to pick it up tomorrow for your friend?"

Young replied, "Sure I will get it in the morning[.]" As another example, in or around July 2017, Britt made a $17,000 payment to Watson through Young and Company 1.

**B.     Vistant Prime Contracts 5-14 (Appx. Value of $497.8 Million)**

Once Vistant became the prime contractor, the coconspirators, including Barnes and Young, continued discussing bribes to Watson.

**i.     Contract 5 (Awarded, Appx. Value of $30 Million)**

In and around early 2017, Britt and Barnes formed a joint venture between Apprio and Vistant to bid on a USAID contract.

On or about April 13, 2017, at Britt's direction, an Apprio employee emailed Young, copying Britt, requesting permission to request a facility security clearance for Vistant as a subcontractor for Apprio. Watson approved the request. During this period, Britt continued to make bribe payments to Watson through Young to obtain USAID contracts.

On or about April 27, 2017, Barnes and Young texted to discuss a strategy for Vistant to obtain contracts via Watson. The next month, in reply to a text from Barnes about a meeting with Watson, Young noted, "[Watson] is bugging me about the money so I will ask again tonight."

Barnes replied, "about paying him or what we will allocate?"

Young replied, "His current payment[.]"

Barnes replied, "So you're going to the bank right?"

Young replied, "when the money hits my account." Moreover, around the same time that Young texted with Barnes, Young separately texted Watson, "It's supposed to hit my account tomorrow. Where is my invoice?"

On or about September 27, 2017, Britt emailed Barnes about an upcoming meeting with Watson. Barnes asked Britt, "What is this meeting regarding?"

Britt responded, "A one on one introduction to [Watson]. Wants to know you re: upcoming opportunities. Introduce you to the family :)".

On or about March 1, 2018, Young texted Barnes, "Send [Watson] your cap [capability] statement. There maybe [sic] a sole source [contract] in our future. Big money[.]"

Barnes replied, "Ok will do[.]"

Young replied, "[Watson] needs it for tomorrow morning."

Barnes replied, "Sent[.]" In the email sent to Watson, Barnes stated, "Mr. Watson, Please see the attached capability statement. Feel free to contact me with any questions."

On or about March 27, 2018, Watson and Young discussed whether Barnes and Vistant could serve as the prime contractor on a USAID contract. More specifically, Watson texted Young, "Will need to have a discussion with you [Young] and [Barnes] about an RFP [Request for Proposal] that I'll need to put out. Have to decide on an approach[.]"

To aid that discussion, Young texted Barnes, "What's your Thursday or Friday afternoon look like? [Watson] wants to discuss a Rfp he [is] putting out."

The next day, Watson emailed both Barnes and Young: "[L]et me know if your firm has 'near' capability to either lead/manage or JV [joint venture]." Watson attached a "Market Research Memo," which listed 18 small businesses capable of completing the contract (which did not list Vistant); and a statement of work for the contract with the following label, "[PROCUREMENT SENSITIVE_ DO NOT SHARE]".

On or about March 29, 2018, a couple of days after Watson shared the procurement-sensitive information, Young texted Barnes about purchasing a suite to watch a basketball game in Washington, D.C., "$3000 for the suite next Friday. You good?"

Barnes replied, "Call me[.]"

Young later texted Watson, "Don't be asking questions. Getting a suite for the [W]izards game."

Watson replied, "Phase One has been approved to start[.]"

On or about April 24, 2018, Barnes texted Young about arranging "a sit down w[ith] [Watson] again[.]"

Young replied, "Yes[.]"

Barnes replied, "Want to iron out agreement[.]" Five days later, Barnes texted Young, "Good meet up w [Watson.]"

Young replied that Barnes "cleared things up. Moving forward everyone is going to be happy[.]"

On or about May 3, 2018, Watson emailed Barnes and Young: "Please find attached a RFI [Request for Information] that requires response prior to providing your firm consideration of a Sole Source Award[.]"

The next day, Barnes texted Young, "I'm not sure how [Watson] wants to present it. I'm good with including [Company 1.]" Four days later, Barnes emailed Watson a draft response to the RFI on behalf of Vistant and Company 1.

On or about July 31, 2018, shortly before USAID awarded Vistant its first prime contract, Watson discussed with Young how he would approach Barnes to ask for payments. Watson texted Young, "I[']m starting money talk with [Barnes] just to test the water[.]"

Young replied, "Do your thing my brother[.]"

Watson later stated, "I[']m sure you appreciate the PRE work that goes into all of this—and it[']s work[.] Just to get people [in] the program office to see things my way[.] Going to signal[.]"

On or about August 15, 2018, USAID awarded Vistant its first contract, valued at approximately $30 million (Contract 5).

### ii.     Contracts 6, 7 (Awarded, Appx. Value of $29 Million)

On or about the same day that Vistant was awarded its first USAID contract, Watson's texts show him complaining to Young about how he (Watson), as a government employee, was not making as much as the people he was assisting in the private sector.

On or about August 15, 2018, Watson texted Young, "[I]t[']s like I[']m out here on my own making deals so others can flourish no matter the amount I get monthly it[']s not the same as owning a business and flourishing for self ... it[']s like being on an island waiting for all the shit to hit the fan[.]"

Young replied, "I get what you are saying. Why don[']t you make that leap. I would help 100%. We could team or however you want to[.]"

Watson replied, "Not until this all comes full circle and where I am sure that I am thoroughly entrenched with future projects with [US]AID and now the State Department... at least 2yrs[.]"

In addition, within two months of receiving its first USAID contract through Watson in or around August 2018, Vistant received two additional USAID contracts. On September 11, 2018, USAID awarded Vistant its second contract, for which Apprio was a subcontractor, valued at approximately $25.5 million. Watson emailed Barnes, formally referring to Barnes as "Mr." and stating: "Please also provide times . . . for you and your firm to meet for a formal award kickoff meeting with me and the cognizant Contracting Officers Representative. Congratulations on your award and your future work with USAID." In awarding this second contract to Vistant, Watson included Young on the email to Barnes. In addition, Watson sent this same email a second time

to Barnes, and blind carbon copied an account for a shell company that Watson incorporated. Other emails show that Watson used this shell company to submit fake invoices to Young to receive payments that originated from Barnes. On or about October 3, 2018, Vistant was awarded its third USAID contract, valued at approximately $3.5 million.

### iii.     Contract 8 (Awarded, Appx. Value of $19.5 Million)

Approximately one year after receiving an initial set of three contracts from USAID in or around the summer of 2018, Barnes and his coconspirators continued to discuss the scheme to secure additional contracts through bribes in or around the summer of 2019.

For example, emails and text messages among Barnes, Young, and Watson on or about July 10 and 11, 2019, show that they met at a restaurant shortly before USAID awarded Vistant another contract. After exchanging text messages with Young and Watson about the meeting, Barnes replied on July 11, "[S]ee y'all there," and a few hours later, "At the bar, got a table for three[.]" On or about September 30, 2019, Vistant was awarded its fourth contract.

### iv.     Contract 9 (Awarded, Appx. Value of $28.5 Million)

In or around the months leading to USAID's award of a fifth contract to Vistant, Barnes, Watson, and Young continued engaging in the bribe scheme. Around this time, the amount of the bribe payments to Watson increased.

On or about October 31, 2019, Watson texted a Vice President at Apprio to arrange to meet in person to obtain a cash bribe payment.

On or about January 2, 2020, Barnes texted Young, "Has Apprio paid you yet?" The next day, Barnes texted Young, "Did Apprio get back to you?" On January 7, 2020, Barnes texted Young, "Did [Apprio] pay you?"

Young replied, "[I'm] on the phone with [Britt]." Around that time, Young exchanged text messages with Britt about having Apprio's Accountant send payments to Watson through Young.

Britt texted Young, "6500," and, "I thought it was 4000. [Apprio's Accountant] told me that number."

Young replied, "Done[.]"

Britt stated, "I gave you the wrong number. It's worse," and "7500[.]"

Young replied, "[W]ill redo[.]" Young funneled monthly payments to Watson that increased around this time from $4,000 to $7,500. Furthermore, Watson had requested the increased bribe payments.

On or about January 13, 2020, Barnes arranged for Company 1 to serve as a subcontractor to Vistant on a USAID contract. That day, Watson emailed Barnes and blind carbon copied Young. The email included a document titled, "USAID endorsement letter to Company 1." This was an official USAID letter from Watson to Barnes and Vistant, which stated Vistant was "requesting to add [Company 1] to this contract as a sub-contractor." The letter further stated: "It is to my [Watson's] understanding that [Company 1] brings a capability in agile solutions and IT managed services which will support [Vistant] in satisfying their contractual requirements on both the unclassified side and classified support side up to Top Secret level support." Ultimately, Watson approved Barnes' request to add Company 1 as a subcontractor.

On or about July 2, 2020, Watson submitted a fraudulent invoice to Young and Company 1 through his shell company. The following month, Vistant was awarded its fifth USAID contract for which Apprio served as a subcontractor. Watson submitted four invoices through his shell company monthly through in or around October 2020.

      **v.**      **Contracts 10, 11 (Awarded, Appx. Value of $104 Million)**

In or around 2021, Barnes continued to bribe Watson, including through payments funneled through Young as an intermediary. During this time, Vistant was awarded its sixth and seventh USAID contracts.

      **vi.**      **Contracts 12, 13, and 14 (Not Awarded, Appx. Value of $286.8 Million)**

After Vistant received seven contracts from USAID, for which Apprio served as a subcontractor for two of the contracts, Barnes attempted to obtain more contracts by receiving confidential procurement information from Watson, and by giving more bribes to Watson. In or around August 2022, Watson provided Barnes with a technical evaluation package containing confidential source-selection information as to the status of proposals Vistant's competitors submitted for the award of a contract with a value of approximately $143 million (Contract 12). The package included USAID's assessment of the strengths and weaknesses of bids indicating Vistant was not the top candidate. Barnes continued to provide bribes to Watson, but ultimately Vistant was not awarded Contract 12.

The scheme initially came to USAID's attention in late 2022, after a former employee of Vistant showed sensitive procurement information to a competitor, which then reported this misconduct to USAID. Having not been fully revealed, the scheme continued, but no additional contracts were awarded to Vistant as a result.

*      *      *

In sum, for the 14 prime contracts involved in the conspiracy, valued at approximately $552.5 million, USAID allocated to Apprio and Vistant approximately $156,034,338. Only a portion of this allocated amount constitutes the companies' profit from the contracts. Specifically

(with all figures being approximate), Apprio's gross profit from the four awarded contracts was $24,707,325; Vistant's gross profit from the seven awarded contracts was $31,477,758; and Vistant's intended profit from the three unawarded contracts was $14,881,932.

## THE SECURITIES FRAUD SCHEME

In or around 2023, Apprio, acting through Britt, engaged in a scheme in which Apprio fraudulently induced Company 2, which had an investment pool that was licensed as a SBIC, to purchase from Apprio's parent company a 20% equity stake in Apprio's parent company for $4 million and simultaneously extend to Apprio's parent company a $4 million loan secured by shares of Apprio stock.

On or about November 16, 2023, Britt executed agreements that resulted in the equity sale and loan. Britt falsely represented in paragraph 2.9 of the equity sale contract that "The Company [including Apprio] is not in violation or default . . . to its knowledge, of any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which would have a Material Adverse Effect." Moreover, Britt falsely represented in paragraph 4(k) of the loan agreement that "Borrower and each of its Subsidiaries is in compliance with all Legal Requirements where a failure to be in compliance could reasonably be expected to have a Material Adverse Effect[.]" Furthermore, in paragraph 4(l) of the loan agreement, Britt falsely represented that "[N]either Borrower nor any of its Subsidiaries are a party to any litigation and is not, to its knowledge, the subject of any government investigation, and Borrower has no knowledge of any such pending litigation or investigation or the existence of circumstances that reasonably could be expected to give rise to such litigation or investigation[.]" In addition to making the false material representations in the stock purchase and loan agreements with Company 2, Britt intentionally omitted during his negotiations with Company 2 the material fact that he had regularly bribed Watson for years, which was intended to deceive and induce Company 2 into executing the agreements.